RICKY KAMDEM-OUAFFO, d/b/a
KAMDEM GROUP,

        Plaintiff,

    v.

TASK MANAGEMENT INC., STEFAN
MOHAN, LINDA HARISSON, CORIE
HESS, and CAMPBELL SOUP
COMPANY,

        Defendants.

No. 1:17-cv-7506 (NLH/JS)

RICKY KAMDEM-OUAFFO,

        Plaintiff,

    v.

CAMPBELL SOUP COMPANY, TASK
MANAGEMENT INC., DENISE M.
MORRISON, CARLOS J. BARROSO,
SCOTT KELLER, CARY HAYES,
STEFAN MOHAN, CORIE HESS,
LINDA HARRISON, JONATHAN D.
WETCHLER, BERNARD E. JACQUES,
DUANE MORRIS (FIRM AND
AFFILIATE OFFICES), MCELROY,
DEUTSCH, MULVANEY & CARPENTER
LLP, DAYNE R. JOHNSON, and
TREVOR H. TANIGUCHI,

        Defendants.

No. 1:18-cv-298 (NLH/JS)

**OPINION**

**APPEARANCES**:

RICKY KAMDEM-OUAFFO
1 RICHMOND STREET #2100
NEW BRUNSWICK, NJ 08901
     Appearing pro se

DAYNE RASHARD JOHNSON
MCELROY DEUTSCH MULVANEY & CARPENTER
1300 MOUNT KEMBLE AVE
MORRISTOWN, NJ 07962-8100
     On behalf of Defendants Task Management Inc., Stefan Mohan,
     Linda Harrison, Corie Hess, Bernard Jacques, McElroy,
     Deutsch, Mulvaney & Carpenter LLP, and Dayne Johnson

MICHAEL RATO
BERNARD E. JACQUES (admitted pro hac vice)
MCELROY DEUTSCH MULVANEY & CARPENTER LLP
1300 MT. KEMBLE AVENUE
P.O. BOX 2075
MORRISTOWN, NJ 07962
     On behalf of Defendant McElroy, Deutsch, Mulvaney &
     Carpenter

JONATHAN D. WETCHLER (admitted pro hac vice)
ALIZA R. KARETNICK (admitted pro hac vice)
DUANE MORRIS LLP
30 SOUTH 17TH STREET
PHILADELPHIA, PA 19103
     On behalf of Defendants Campbell Soup Company, Denise
     Morrison, Carlos Barroso, Scott Keller, Duane Morris LLP,
     Jonathan Wetchler, and Trevor Taniguchi

TREVOR HARUO TANIGUCHI
DUANE MORRIS LLP
1940 ROUTE 70 EAST
CHERRY HILL, NJ 08003
     On behalf of Defendants Campbell Soup Company, Denise
     Morrison, Carlos Barroso, Scott Keller, Jonathan Wetchler,
     and Duane Morris

AMBER M. SPATARO
LITTLER MENDELSON PC
ONE NEWARK CENTER
8TH FLOOR
NEWARK, NJ 07102
     On behalf of Defendant Cary Hayes

**HILLMAN**, District Judge

This Opinion and its accompanying Order address two separate but largely overlapping matters now pending before this Court: Docket No. 17-7506 and Docket No. 18-298.[1] These cases arise from Plaintiff's overriding allegation that he lost his job due to retaliation for filing various complaints. Plaintiff brings claims under Title VII and the New Jersey Law Against Discrimination (NJLAD), as well as other statutory and common law claims. Between both dockets, before the Court are two motions for preliminary injunction, several motions to dismiss, several motions to strike, a motion to set aside entry of default, and a motion to compel defendants to file an answer.[2]

For the reasons that follow, the Court will allow Plaintiff's Title VII and NJLAD claims to proceed in part against Task Management. The Court will otherwise dismiss Plaintiff's claims. Plaintiff is permitted to file a motion for leave to amend his complaint to attempt to cure any deficiencies the Court has identified in this Opinion.

---

[1]    These cases have been consolidated for discovery and case management purposes only. The Court will now consolidate these matters for all purposes to proceed under the 18-298 docket.

[2]    Plaintiff asks this Court to convert the motions to dismiss into summary judgment motions. The Court will not consider evidence outside the scope of a Rule 12(b)(6) motion, and the Court declines, in its discretion, to so convert the motions.

## I. Background

### A. Plaintiff's Factual Allegations

The Court takes its facts from Plaintiff's January 8, 2018 Complaint in the 18-298 action.[3]  On August 1, 2017, Linda Harrison, a Senior Technical Recruiter at Task Management,[4] contacted Plaintiff to inquire whether Plaintiff had the skills to take on a project with Task Management's client, Campbell Soup.

Plaintiff showed interest and Harrison submitted Plaintiff's resume to Campbell Soup.  Plaintiff was then interviewed by Campbell Soup Senior Director Scott Keller. Following the interview, Plaintiff was informed by Harrison that he was selected for a contract role at Campbell Soup.  On August 10, 2017, Plaintiff entered into an agreement on behalf of the Kamdem Group, his sole proprietor business, with Task Management for a role as a consultant at Campbell Soup in its Flavor

---

[3]     While the Court must base its decision in the 17-7506 action on the facts alleged in the operative complaint in that case, the underlying facts have little relevance in deciding the pending motions in that case.

[4]     Plaintiff's contract with Task Management states Task Management "serves as a broker between individuals, companies and corporations seeking individuals, companies and corporations with various computer skills and individuals, companies and corporations with those skills."

Technology Unit (the "Task Management Agreement").[5]  It appears

the agreement was executed by Stephan Mohan, a director at Task

Management.  Under the agreement, termination would occur upon

the earlier of the following: (1) completion of the project or

(2) at the election of Plaintiff, Task Management, or Campbell

Soup.[6]

Plaintiff began working with Campbell Soup on August 21,

2017 at its Camden location.  Plaintiff was assigned three

projects with Campbell Soup under the supervision of Keller.

Campbell Soup issued a work Purchase Order, approved and signed

by Carlos Barroso,[7] that showed that Campbell Soup disbursed

money to Task Management for every hour of work performed by

---

[5]     As this Court will later elaborate on, the Court considers
Plaintiff and the Kamdem Group to be one and the same.  While
the contract is between Task Management and the Kamdem Group,
the Court will refer to Plaintiff as the party to the Task
Management Agreement in this Opinion.

[6]     The "Termination" provision of the Task Management
Agreement states:

    Termination of this Agreement will occur at the earliest
    of the following events.

    A.    The Completion of the Assignment, that is the
          project assigned to the Consultant, or

    B.    at the election of the Company or the Client,
          or the Consultant.

[7]     Carlos Barroso was Plaintiff's next level Supervisor at
Campbell Soup.

Plaintiff.  Task Management issued a biweekly pay schedule for Plaintiff.

Approximately eleven days after he started work, on September 1, 2017, Plaintiff was informed by Harrison that Campbell Soup had decided to suspend the projects Plaintiff had been working on due to financial hardship and that Plaintiff was not to return to work, nor contact Keller or any other Campbell Soup employees.  Plaintiff alleges that after this call, he remembered that he had been contacted earlier that day by a recruiter who was looking to find someone to fill a role at Campbell Soup.  Upon further conversations with the recruiter, it became Plaintiff's understanding that this open role was identical to the one Plaintiff was informed by Harrison was suspended.

Plaintiff pleads that around September 1, 2017, Campbell Soup began searching for a person with Plaintiff's qualifications.  Plaintiff was contacted by multiple recruiters regarding Campbell Soup's search.  Plaintiff alleges two recruiters contacted Cary Hayes, a Campbell Soup employee, about Plaintiff and that Hayes told them to stop speaking and wasting their time with Plaintiff.  Plaintiff pleads the job listing was eventually removed from public viewing and that the process to find Plaintiff's replacement was taken up by a paid executive search firm.

On September 8, 2017, following what appears to be several unanswered e-mails to Harrison regarding his termination and potential openings at Campbell Soup, Plaintiff inquired about Task Management officially withdrawing its representation of him. Harrison responded that Task Management would withdraw its representation of him for any further job postings through Campbell Soup. After this withdrawal, it appears Plaintiff attempted in various ways to apply for his role at Campbell Soup again, which had been relisted, but Plaintiff was not rehired or given an opportunity to compete for the role.

Johnathan Wetchler, a legal representative of Campbell Soup from the law firm Duane Morris, informed Plaintiff on November 15, 2017 that his previous position had been filled in October 2017. Plaintiff argues this information contradicts the fact that Campbell Soup had retained an executive search firm to look for someone to fill the position. Plaintiff pleads that Denise Morrison,[8] Barroso, Keller, and Hayes asked Wetchler to communicate to Plaintiff that his role at Campbell Soup had been filled in October 2017.

Plaintiff learned from Corie Hess, Task Management's Human Resource Manager, that the contract with Task Management was terminated because Task Management or Campbell Soup found out

---

[8] Morrison is a "Senior Executive level employee of Campbell's Soup Company." (Compl. ¶ 123).

Plaintiff had filed lawsuits with other employers.  Plaintiff
admits to filing lawsuits against previous employers.  On
September 22, 2017, Plaintiff reported to Scott, Mohan, and
possibly others that Hess had told him he was terminated because
of his previous lawsuits.  Plaintiff alleges Mohan, Morrison,
Barroso, Keller, and Hayes either made the decision or supported
the decision to terminate the Task Management Agreement and
encouraged subordinates to lie to Plaintiff about why the Task
Management Agreement was terminated.

Bernard Jacques is a legal representative for Task
Management from the law firm McElroy, Deutsch, Mulvaney &
Carpenter ("MDMC").  Jacques sent Plaintiff an October 6, 2017
letter, which "threaten[ed] Plaintiff [with] criminal
prosecution."  Plaintiff pleads Jacques initiated a private
citizen criminal prosecution against Plaintiff in Connecticut
and told Plaintiff that he "wanted to send Plaintiff for
psychiatry treatment."  Plaintiff pleads he was contacted by a
Ridgefield, Connecticut detective by the name of Lou Kava.
Plaintiff pleads Campbell Soup and Task Management attempted to
induce the State of Connecticut to launch a criminal
investigation against him.

**B. Procedural Posture in the 17-7506 action**

Plaintiff initiated the 17-7506 action on September 25,
2017 with the filing of a 109-page complaint, containing 693

numbered paragraphs.  The initial complaint brought claims against Task Management, Mohan, Harrison, Hess, and Campbell Soup (listed as a "nominal defendant").  Plaintiff asserted federal question as his basis for jurisdiction.  The Court issued an October 2, 2017 Order to Show Cause, finding Plaintiff's complaint did not raise a federal question, finding Plaintiff's complaint in violation of Federal Rule of Civil Procedure 8(a), and allowing Plaintiff fifteen days to amend his complaint to properly assert subject matter jurisdiction.

Plaintiff filed his Amended Complaint on October 10, 2017, removing Campbell Soup as a defendant in what the Court interpreted as an attempt to assert diversity jurisdiction.  The Amended Complaint was 155 pages with 943 numbered paragraphs. On October 11, 2017, the Court issued another Order to Show Cause finding Plaintiff failed to sufficiently plead the citizenship of Defendants.  The Court again found Plaintiff violated Rule 8(a) and allowed Plaintiff fifteen days to file another amended complaint.

Plaintiff filed a Second Amended Complaint on October 13, 2017, which was 154 pages and consisted of 953 numbered paragraphs.  The Second Amended Complaint did not list Campbell Soup as a defendant.  The Court issued an October 17, 2017 Order to Show Cause, again finding Plaintiff failed to properly plead citizenship, finding Plaintiff violated Rule 8(a), and allowing

Plaintiff fifteen days to file another amended complaint.  On October 18, 2017, Plaintiff filed his Third Amended Complaint, consisting of 164 pages and 990 numbered paragraphs.  The Third Amended Complaint did not list Campbell Soup as a defendant.

Plaintiff filed an October 18, 2017 Motion for Preliminary Injunction in the 17-7506 action.  This motion was denied as moot by the Court, as Plaintiff thereafter filed a February 7, 2018 Motion for Preliminary Injunction.  Also before the Court is a December 11, 2017 Motion to Dismiss.

**C. Procedural Posture in the 18-298 Action**

Plaintiff's January 8, 2018 Complaint brings fifteen counts.  Counts 1 and 2 bring Title VII claims, and Counts 3, 4, 5, and 6 bring NJLAD claims.  Counts 7 and 8 bring claims under the New Jersey Conscientious Employee Protection Act (NJCEPA).  Plaintiff then brings the following common law claims: breach of contract (Count 9); breach of the implied covenant of good faith and fair dealing (Count 10); negligence, negligence per se, and gross negligence (Count 11); slander, libel and defamation (Count 12); wrongful termination (Count 13); intentional infliction of emotional distress (Count 14); and tortious interference with contract, business, and economic opportunities (Count 15).

Before the Court are Plaintiff's Motion for Preliminary Injunction, several Motions to Dismiss, a Motion to Set Aside

Default, several Motions to Strike, and Plaintiff's Motion
requiring Defendants to Answer the Complaint.

## II. Motion to Dismiss in the 17-7506 Action

The sole argument advanced in Defendants Task Management,
Mohan, Hess, and Harrison's Motion to Dismiss in the 17-7506
action is that this Court lacks diversity jurisdiction because
Campbell Soup is a citizen of New Jersey and there is an
ambiguity as to whether Campbell Soup is a party to the 17-7506
action. The Court finds Campbell Soup has not been a party to
the 17-7506 action since Plaintiff filed his First Amended
Complaint.

While Campbell Soup was listed as a defendant in the
original complaint, the three amended complaints that followed
did not list Campbell Soup as a defendant. The Court has read
Plaintiff's papers moving for a preliminary injunction. While
they seek relief against Campbell Soup, that does not alone make
Campbell Soup a party to this action; neither does Judge
Schneider's December 4, 2017 Order and Campbell Soup's
subsequent participation in litigating this matter following
that Order. Judge Schneider's December 4, 2017 Order stated
that "the Court f[ound] there is an ambiguity whether plaintiff
intends to include Campbell as a named defendant" and ordered
Campbell Soup to "attend all scheduled court conferences unless
otherwise Ordered by the Court or Campbell is formally dismissed

from the case." Finding that Campbell Soup is no longer a party to this case, the Court will formally dismiss Campbell Soup from the 17-7506 action and the Court will deny Defendants' Motion to Dismiss on this basis.

### III. Subject Matter Jurisdiction

Finding Campbell Soup is not a party to the 17-7506 action, the Court has diversity jurisdiction over the 17-7506 matter pursuant to 28 U.S.C. § 1332. The Third Amended Complaint pleads that Plaintiff is a citizen of New Jersey. It pleads Task Management is incorporated in Connecticut and has its principal place of business in Connecticut, making it a citizen of Connecticut. The Third Amended Complaint also pleads Mohan is a citizen of New York, Hess is a citizen of Connecticut, and Harrison is a citizen of Connecticut. It similarly pleads an amount in controversy in excess of $75,000, exclusive of interest and costs, giving this Court diversity jurisdiction pursuant to 28 U.S.C. § 1332.

The Court has federal question jurisdiction over the 18-298 matter pursuant to 28 U.S.C. § 1331, as Plaintiff asserts a cause of action under Title VII. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## IV. Plaintiff's Motions for Preliminary Injunction

The Court will deny Plaintiff's motion for preliminary injunction in both the 17-7506 action and the 18-298 action. "A district court must consider four elements in determining whether to grant a preliminary injunction: (1) reasonable probability of success on the merits; (2) irreparable injury to the moving party; (3) harm to the nonmoving party; and (4) the public interest." Goodwin v. Castille, 465 F. App'x 157, 160 (3d Cir. 2012) (citing Iles v. de Jongh, 638 F.3d 169, 172 (3d Cir. 2011)). Regardless of the likelihood of success on the merits, Plaintiff has not shown an irreparable injury.

"Irreparable injury has been defined as 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" Figueroa v. Precision Surgical, Inc., 423 F. App'x 205, 210 (3d Cir. 2011) (quoting Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989)). "Indeed, such loss must not be merely economic, but 'of a peculiar nature, so that compensation in money cannot atone for it.'" Id. (quoting A. O. Smith Corp. v. F.T.C., 530 F.2d 515, 525 (3d Cir. 1976)); accord Beberman v. U.S. Dep't of State, 675 F. App'x 131, 134 (3d Cir. 2017) ("The preliminary injunction must be the only way of protecting the plaintiff from harm." (quoting Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992))); Adams v. Freedom Forge Corp., 204 F.3d 475,

13

484-85 (3d Cir. 2000) ("The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." (citing Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102-03 (3d Cir. 1988))). "No less than a 'clear showing of immediate irreparable injury' is required." Figueroa, 423 F. App'x at 210 (citing Ammond v. McGahn, 532 F.2d 325, 329 (3d Cir. 1976)).

Plaintiff's Third Amended Complaint in the 17-7506 action makes various requests for damages as well as for reinstatement at his previous position. Plaintiff's "Demand for Relief" in the 18-298 action similarly seeks damages and reinstatement. The Court finds that, if Plaintiff can prove his claims, monetary damages will be sufficient to compensate Plaintiff. Plaintiff has not provided this Court with any convincing reason why monetary damages would not sufficiently compensate him or to justify the Court granting the extraordinary remedy of a preliminary injunction. See Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 131 (3d Cir. 2017) ("A preliminary injunction is an extraordinary remedy granted in limited circumstances.").

"Although irreparable injury is only one of four 'factors,' a moving party's inability to establish irreparable injury is, alone, fatal to the motion." Johnson & Johnson Orthopaedics, Inc. v. Minn. Mining & Mfg. Co., 715 F. Supp. 110,

112 (D. Del. 1989) (citing <u>Phillips Petroleum Co. v. U.S. Steel</u> <u>Corp.</u>, 616 F. Supp. 335, 337-38 (D. Del. 1985)). As Plaintiff has failed to show irreparable injury, the Court will deny his motions for a preliminary injunction.

## V. Plaintiff's Repeated Violations of Federal Rule of Civil Procedure 8(a)

Federal Rule of Civil Procedure 8(a) states:

A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Rule 8(d)(1) further states: "Each allegation must be simple, concise, and direct." Faced with Plaintiff's 285-page initial complaint in the 18-298 action, the Court finds Plaintiff has unquestionably violated Rule 8. In no way can Plaintiff's Complaint be described as "short and plain."[9]

Nonetheless, courts "tend to be flexible when applying procedural rules to pro se litigants, especially when

---

[9] The Court notes Plaintiff appears to recognize this rule in his Complaint, despite his utter failure to abide by it. Page 68 of Plaintiff's Complaint in the 18-298 action contains the header: "SHORT AND PLAIN STATEMENT OF GROUNDS FOR RELIEF."

interpreting their pleadings." <u>Mala v. Crown Bay Marina, Inc.</u>, 704 F.3d 239, 244 (3d Cir. 2013). Indeed, this is an "obligation" for district courts, "driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect <u>pro se</u> litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" <u>Higgs v. Attorney Gen. of the U.S.</u>, 655 F.3d 333, 339 (3d Cir. 2011) (alteration in original) (quoting <u>Tristman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 475 (2d Cir. 2006)).

Plaintiff has been made aware of Rule 8 and how it can be violated. Prior to the filing of Plaintiff's 18-298 Complaint, this Court has reprimanded Plaintiff for repeated violations of this important rule of civil procedure.[10] Nonetheless, in the interest of reaching the merits of this case and moving this case forward, and in consideration of Plaintiff's pro se status, the Court will not dismiss Plaintiff's Complaint in either the 17-7506 or 18-298 matters for violation of Rule 8. However, as the Court will elaborate on in its consideration of Plaintiff's Amended Complaint below, which this Court refuses to consider, the Court will no longer grant Plaintiff leniency in the filing

---

[10] The Court issued Orders to Show Cause in the 17-7506 action on October 2, 2017, October 11, 2017, and October 17, 2017, all stating that Plaintiff violated Rule 8 and requiring amended filings to adhere to Rule 8.

of unnecessarily long and repetitive filings in this case,
related matters, or any other matter before the undersigned.
Plaintiff has been repeatedly reminded of the requirements of
Rule 8, with this Opinion serving as Plaintiff's final reminder.

### VI. Plaintiff's Amended Complaint in the 18-298 Action

Plaintiff filed an Amended Complaint on April 23, 2018.
After the various defendants filed their motions to dismiss,
Plaintiff requested an extension from the Court to respond to
the motions.  The Court's March 20, 2018 Order stated that
Plaintiff's opposition to the pending motions was extended to
April 23, 2018 and reset the motion day for May 7, 2018.  The
moving defendants appear to argue that this extension related
only to any opposition briefs Plaintiff might file, not to the
filing of an amended complaint.  Regardless of whether the
Court's Order extended the time in which Plaintiff could file an
amended complaint as a matter of course, in no way did this
Court's Order grant Plaintiff permission to file an Amended
Complaint consisting of 332 pages and 1200 paragraphs.

This Court has previously found a 139-paragraph amended
complaint "d[id] not provide a 'short and plain statement' of
the claims" as required by Rule 8.  Wilcher v. Potter, No. 08-
2723, 2009 WL 235497, at *2 (D.N.J. Jan. 29, 2009).  The length
of the Amended Complaint in this case more than doubles the
length of the amended complaint in Wilcher.  Similarly, in

Brejcak v. County of Bucks, No. 03-4688, 2004 WL 377675 (E.D. Pa. Jan. 28, 2004), the court found a 45-page, 216-paragraph amended complaint "runs afoul of the letter and spirit of the Federal Rules." Id. at *2. The court noted: "While there is no precise algorithm that answers at what length a complaint becomes objectionable, it is reasonable to conclude that 216 separate paragraphs are excessive under notice pleading, which the Federal Rules require." Id. at *3. The Complaint in this action is much longer than the 45-page complaint in Brejcak.

The Court has no hesitation in concluding that a 332-page, 1200-pagaraph amended complaint is objectionable and a blatant violation of both the explicit mandates and the spirit of the Federal Rules. This Court will not exert its valuable time and resources, nor require Defendants to exert their time and resources, reading, analyzing, and responding to an amended complaint of this length, particularly after analyzing and responding to an initial complaint consisting of 285 pages and 1581 paragraphs, which was replete with repetitive statements this Court had to parse through.

Four Motions to Strike were filed with regard to Plaintiff's Amended Complaint. On April 27, 2018, Defendants Campbell Soup, Morrison, Barroso, Keller, Duane Morris, and Wetchler moved to strike Plaintiff's Amended Complaint in its entirety. Similarly, on May 4, 2018, Defendants Task

Management, Mohan, Hess, Harrison, Jacques, and MDMC also moved to strike Plaintiff's Amended Complaint. On June 20, 2018, Defendant Trevor Taniguchi and Defendant Dayne Johnson separately moved to strike the Amended Complaint.

Federal Rule of Civil Procedure 12(f) provides:

> The Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
>
> (1) on its own; or
>
> (2) on motion made by a party either before responding to the pleading, or if a response is not allowed, within 21 days after being served with the pleading.

The Court will strike the purported Amended Complaint in its entirety pursuant to Rule 8 and Rule 12(f).

As follows, the Court will dismiss most of Plaintiff's claims, but Plaintiff will be permitted to file a motion for leave to amend his complaint, if he so chooses. Any proposed amended complaint must conform to Rule 8 and must take into account the legal conclusions already made by this Court in this Opinion and the accompanying Order. If any proposed amended complaint is found to violate Rule 8, the Court will not hesitate to dismiss that complaint too, on motion of any defendant or sua sponte.

Finally, the Court notes that Plaintiff clearly decided to amend his complaint in lieu of filing opposition to the various

motions to dismiss in the 18-298 matter.  In the interest of
moving this matter forward, the Court will consider the merits
of these motions and of Plaintiff's claims.  The Court concludes
Plaintiff will not be prejudiced by this course of action, as
Plaintiff is permitted to seek leave to file an amended
complaint to cure the noted deficiencies in his claims.

## VII. Defendants' Motions to Dismiss in the 18-298 Action

### A. Rule 12(b)(6) Standard

When considering a motion to dismiss a complaint for
failure to state a claim upon which relief can be granted
pursuant to Federal Rule of Civil Procedure 12(b)(6), a court
must accept all well-pleaded allegations in the complaint as
true and view them in the light most favorable to the plaintiff.
Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).  It is well
settled that a pleading is sufficient if it contains "a short
and plain statement of the claim showing that the pleader is
entitled to relief."  Fed. R. Civ. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to
dismiss does not need detailed factual allegations, a
plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do . . . ."  Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007) (alteration in original)

(citations omitted) (first citing Conley v. Gibson, 355 U.S. 41, 47 (1957); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994); and then citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (alterations in original) (citations omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679 (2009)).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Twombly, 550 U.S. at 563 n.8 (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Iqbal, 556 U.S. at 684 ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before Twombly."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough

facts to state a claim to relief that is plausible on its face.'" Malleus, 641 F.3d at 563 (quoting Twombly, 550 U.S. at 570).

## B. Plaintiff's Pro Se Status

One of the arguments for dismissal in the 18-298 action is based on Plaintiff's pro se status. It is argued that Plaintiff is seeking to bring certain claims on behalf of the Kamdem Group, which Task Management identifies as a New Jersey corporation and as an "incorporated consulting business." Task Management argues Plaintiff, a non-lawyer, cannot represent the Kamdem Group in federal court.

The Court recognizes that a corporation must be represented by a licensed attorney in federal court. Indeed, "[i]t has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel." Rowland v. Cal. Men's Colony, 506 U.S. 194, 201-02 (1993); accord United States v. Cocivera, 104 F.3d 566, 572 (3d Cir. 1996) ("[A] corporation may not be represented by other than licensed counsel."); Harrison v. Wahatoyas, 253 F.3d 552, 556 (10th Cir. 2001) ("As a general mater, a corporation or other business entity can only appear in court through an attorney and not through a non-attorney corporate officer appearing pro se." (citing Flora Constr. Co. v. Fireman's Fund Ins. Co., 307 F.2d 413, 414 (10th Cir. 1962))); Cohen v.

Birrane, No. 16-893, 2017 WL 2709566, at *1 n.1 (D. Del. June 23, 2017) ("Just as a business entity cannot represent itself in court, Simbraw, Inc. v. United States, 367 F.2d 373, 373 (3d Cir. 1966), neither may a shareholder acting on behalf of a corporate entity." (quoting Cohen v. Moore, No. 16-661, 2016 WL 7474815, at *2 (W.D. Pa. Dec. 29, 2016))).

However, it is not clear to this Court that the Kamdem Group is a corporation. Task Management cites page two of Plaintiff's Complaint for its assertion that the Kamdem Group is a New Jersey corporation. On page two of his Complaint, Plaintiff pleads the Kamdem Group is "his sole proprietor business name." (Compl. ¶ 6).

As the Court sees no allegations or evidence indicating that the Kamdem Group is an incorporated entity, for the purpose of deciding the pending motions, the Court takes this allegation of the Kamdem Group's legal existence as true and considers it to be an unincorporated sole proprietorship.[11] "[I]t has been recognized that a sole proprietorship has no legal existence apart from its owner, and that an individual owner may represent his sole proprietorship in a pro se capacity." RZS Holdings AVV v. PDVSA Petroleo S.A., 506 F.3d 350, 354 n.4 (4th Cir. 2007);

_____

[11] The Court notes that the Task Management Agreement identifies the Kamdem Group as a corporation. This does not influence the Court's decision on this issue at this time.

accord <u>Lowery v. Hoffman</u>, 188 F.R.D. 651, 653-54 (M.D. Ala. 1999) ("An individual owner may in general represent a sole proprietorship, for a sole proprietorship and its owner are essentially one and the same."); <u>Stone Harbor Recoveries v. Fifarek (In re Fifarek)</u>, 370 B.R. 754, 758 (Bankr. W.D. Mich. 2007) ("[P]ersons operating a business as a sole proprietorship need not be represented by an attorney in federal court proceedings."). This Court finds Plaintiff's pro se status does not warrant dismissal of any of his claims at this time.[12]

The Court further concludes that, through the sole proprietorship, the claims that belong to the Kamdem Group may be asserted by Plaintiff. In <u>Kerwin v. Cage Fury Fighting Championships</u>, No. 14-5159, 2015 WL 5000994 (E.D. Pa. Aug. 20, 2015), the Eastern District of Pennsylvania determined that a purported plaintiff, Xtreme Caged Combat, was a sole proprietorship and "ha[d] no legal existence apart from [the individual to whom it was registered] and d[id] not have standing to sue." <u>Id.</u> at *1. Finding the sole proprietorship was "incapable of bringing suit in its own right," the court found that the individual plaintiff, who was already a party,

---

[12] The Court does not at this time reach the question of whether an incorporated sole proprietorship must be represented by licensed counsel in federal court.

"may assert in his own name the claims made by Xtreme Caged
Combat." Id. The Court will allow similarly here.

## C. Choice of Law

"In a federal question case such as this, a district court
entertaining pendant state claims should follow the choice of
law rules of the forum state." Talbot v. United States, No. 05-
768, 2005 WL 2917463, at *4 (D.N.J. Oct. 28, 2005); accord
Tantillo v. Citifinancial Retail Servs., No. 12-511, 2013 WL
622147, at *7 n.5 (D.N.J. Feb. 19, 2013). Accordingly, the
Court will apply New Jersey choice of law rules. The Court will
apply New Jersey state law to the claims against Campbell Soup
and the individual defendants. The Task Management Agreement,
however, contains a choice of law provision.

"New Jersey choice-of-law rules provide that '[o]rdinarily,
when parties to a contract have agreed to be governed by the
laws of a particular state, New Jersey courts will uphold the
contractual choice.'" Collins v. Mary Kay, Inc., 874 F.3d 176,
183-84 (3d Cir. 2017) (quoting Instructional Sys., Inc. v.
Comput. Curriculum Corp., 614 A.2d 124, 133 (N.J. 1992)).

> Parties' freedom to choose the law applicable to their
> agreements is not without boundaries in New Jersey law.
> New Jersey looks to Restatement § 187 to determine under
> what circumstances a choice-of-law clause will not be
> respected. Specifically, the Restatement provides that
> the parties' contractual choice will not govern if: "(a)
> the chosen state has no substantial relationship to the
> parties or the transaction and there is no other
> reasonable basis for the parties' choice, or (b)

application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties."

Id. at 184 (quoting Instructional Sys., 614 A.2d at 133).

The Task Management Agreement states: "This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the statutes and common law of the State of Connecticut." Finding no reason not to respect this choice of law provision, the Court will adhere to the choice of law provision.

As to Task Management, Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims will be governed by Connecticut law. Whether Plaintiff's statutory claims under New Jersey law can be asserted against Task Management and what law applies to Plaintiff's other common law claims require more analysis.

The Court concludes that Plaintiff's New Jersey statutory claims under New Jersey law can proceed against Task Management. In Nuzzi v. Aupaircare, Inc., 341 F. App'x 850 (3d Cir. 2009), the Third Circuit considered whether a choice of law provision barred certain New Jersey statutory claims. The choice of law provision stated: "This Agreement shall be governed and construed in accordance with the laws of the State of California

26

. . . ." Id. at 851.  The plaintiff argued the provision should

not apply to her New Jersey statutory tort claims because the

provision applied only to the contract claims arising out of the

agreement.  Id. at 852.

The Third Circuit relied on Garfinkel v. Morristown

Obstetrics & Gynecology Associates, P.A., 773 A.2d 665 (N.J.

2001) in determining that the choice of law provision did not

include the plaintiff's statutory claims.  Id. at 852-53.

> In Garfinkel, the Court decided that a mandatory
> arbitration clause in an employment contract, which
> stated that the employee agreed to arbitrate "any
> controversy or claim arising out of, or relating to,
> this Agreement or the breach thereof" did not include
> the employee's claims under the NJLAD.  In so finding,
> the Court explained that the provision "suggests that
> the parties intended to arbitrate only those disputes
> involving a contract term, a condition of employment, or
> some other element of the contract itself" rather than
> the employee's statutory claim.
> Perhaps more importantly, the Court also stated
> that "the policies that support the [NJ]LAD and the
> rights it confers on aggrieved employees are essential
> to eradicating discrimination in the workplace," and
> that New Jersey courts should "not assume that employees
> intend to waive [their rights under the NJLAD] unless
> their agreements so provide in unambiguous terms."  A
> waiver of statutory claims requires that an employee "at
> least . . . agree[] to arbitrate all statutory claims
> arising out of the employment relationship or its
> termination" and "reflect the employee's general
> understanding of the type of claims included in the
> waiver, e.g., workplace discrimination claims."

Id. at 852 (alterations in original) (quoting Garfinkel, 773

A.2d at 688, 672).

The Third Circuit concluded that the choice of law provision was "not broad enough to encompass her statutory claims under the NJLAD or NJFLA, and thus the choice of law clause should not apply to them." Id. at 852-53. The Third Circuit "assume[d] that New Jersey would follow the Garfinkel rationale in the choice of law context as well as the arbitration context, and require an employee to waive her statutory rights unambiguously in order to enforce a choice of law provision against her." Id. at 853.

The District of New Jersey has concluded similarly since the Nuzzi decision. In Carrow v. Fedex Ground Package Systems, Inc., No. 16-3026, 2017 WL 1217119 (D.N.J. Mar. 30, 2017), the court considered the scope of a choice of law provision providing that the contract would be "governed by and construed in accordance with" Pennsylvania law. Id. at *3. The court applied Pennsylvania law to a breach of the covenant of good faith and fair dealing claim. Id. However, the plaintiff also brought two statutory causes of action under New Jersey law. Id. at *1. The court recognized that "[t]he Third Circuit has hesitated to construe a plaintiff's assent to a choice of law provision to constitute waiver of the right to pursue statutory claims." Id. at *5. The Court allowed the statutory claims to proceed. Id.

Similarly, an agreement in A. & M. Wholesale Hardware Co. v. Circor Instrumentation Technologies, Inc., No. 13-475, 2014 WL 714938 (D.N.J. Feb. 24, 2014) similarly considered this issue. There, the choice of law provision provided that the agreement was "to be governed and construed according to the laws of the State of New York." Id. at *3. The court found "the choice of law provision [was] not sufficiently broad to preclude [the] statutory claims." Id. at *4. The Court will follow these well-reasoned opinions and will consider the New Jersey statutory claims as asserted against Task Management.

As to Plaintiff's common law claims, the Court concludes that all claims between Plaintiff and Task Management arising from their relationship under the Task Management Agreement will be governed by Connecticut law. The choice of law provision states "[t]his Agreement and the rights of the parties hereunder," (emphasis added), are to be interpreted in accordance with Connecticut law. The Court finds this to be a broad choice of law provision, intended to cover not only the interpretation of the contract itself and any breach of contract claims, but also other common law claims that may arise between the parties.

The choice of law provision in this case can be contrasted with the choice of law provision in Black Box Corp. v. Markham, 127 F. App'x 22 (3d Cir. 2005), which stated that the agreement

"will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania." Id. at 23 n.1. The Third Circuit found this was "narrowly drafted to encompass only the underlying merger agreement itself, and not necessarily the entire relationship between [the parties]." Id. at 25. Similarly, the court in Board of Education of Cherry Hill v. Human Resources Microsystems, Inc., No. 09-5766, 2010 WL 3882498 (D.N.J. Sept. 28, 2010) found a choice of law provision using the phrase "governed by" referred "only to the law governing the Agreement." Id. at *4. The court reasoned that, "[g]enerally, when a choice-of-law provision is intended to apply not only to interpretation and enforcement of the contract but also to any claims related to the contract, the language used is broader." Id. The language in this case, stating that the agreement as well as "the rights of the parties" is sufficiently broad, and clearly intended to encompass more than just the law governing the Task Management Agreement. All common law claims against Task Management will be assessed pursuant to Connecticut law.

### D. Plaintiff's Claims Against Bernard Jacques, McElroy, Deutsch, Mulvaney & Carpenter, Jonathan Wetchler, and Duane Morris

Under the litigation privilege, the Court concludes that the claims asserted against Jacques, MDMC, Wetchler, and Duane Morris (the "Law Defendants") will be dismissed with prejudice.

"New Jersey's litigation privilege applies to 'any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'"  Allen v. LaSalle Bank, 629 F.3d 364, 369 (3d Cir. 2011) (quoting Hawkins v. Harris, 661 A.2d 284, 289 (N.J. 1995)).

Plaintiff appears to assert Counts 11 through 15 against the Law Defendants.  These counts bring claims for negligence, defamation, wrongful termination, intentional infliction of emotional distress, and tortious interference with contract and economic opportunities.  It also appears Plaintiff asserts NJLAD claims against the Law Defendants.  "In New Jersey, the litigation privilege protects attorneys not only from defamation actions, but also from a host of other tort-related claims." Giles v. Phelan, Hallinan & Schmieg, L.L.P., 901 F. Supp. 2d 509, 523 (D.N.J. 2012) (quoting Loigman v. Twp. Comm. of the Twp. of Middletown, 889 A.2d 426, 436 (N.J. 2006)). "Consequently, New Jersey courts have applied the litigation privilege to intentional and negligent infliction of emotional distress, material misrepresentation, and negligent misrepresentation, fraud, and malicious interference with prospective economic advantage." Id. at 524 (first citing Rabinowitz v. Wahrenberger, 966 A.2d 1091, 1096 (N.J. Super. Ct.

App. Div. 2009); then citing Commercial Ins. Co. of Newark v.
Steiger, 928 A.2d 126, 131-32 (N.J. Super. Ct. App. Div. 2007);
and then citing Ruberton v. Gabage, 654 A.2d 1002 (1995));
accord Giles, 901 F. Supp. 2d at 545 (finding a defendant to an
NJLAD claim could invoke the litigation privilege (citing
Peterson v. Ballard, 679 A.2d 657 (N.J. Super. Ct. App. Div.
1996))); Rickenbach v. Wells Fargo Bank, N.A., 635 F. Supp. 2d
389, 402 (D.N.J. 2009) ("[T]he litigation privilege may be
applied to tort claims of negligence and the breach of a duty of
good faith and fair dealing."); Thomason v. Norman E. Lehrer,
P.C., 183 F.R.D. 161, 169 (D.N.J. 1998) (intentional infliction
of emotional distress). The Court finds all claims against
these defendants are subject to the litigation privilege. See
generally Giles, 901 F. Supp. 2d at 524 ("[I]t appears under New
Jersey law that the only state law claim from which defendants
expressly cannot seek protection through the litigation
privilege is malicious prosecution. Essentially, the New Jersey
Supreme Court has emphasized that the litigation privilege is
intended to be broadly applicable, particularly when statutes do
not specifically abrogate it." (citation omitted) (citing
Loigman, 889 A.2d at 436 n.4)).

The Court considers the nature of the allegations made
against the various attorneys and law firms in this matter. The
Court first considers those allegations made against Jacques and

MDMC.  Plaintiff pleads that Jacques is a legal representative
for Task Management.  (Compl. ¶ 240).  The Complaint references
an October 6, 2017 letter from Jacques.  (Compl. ¶ 246).
Plaintiff also references an e-mail sent by Jacques, which this
Court believes to be the e-mail sending the October 6, 2017
letter, which states it was provided via e-mail.  (Compl. ¶¶
713, 839, 949, 1048).  Plaintiff alleges Jacques sent him
"distressing e-mail communications threatening Plaintiff of
criminal prosecution under the criminal laws of the State of
Connecticut."  (Compl. ¶¶ 713, 839, 949, 1048).  Plaintiff
alleges Jacques "and other legal representatives" researched
incriminating information on him online.  (Compl. ¶ 669).
Plaintiff pleads he "felt threatened and intimidated by" this.
(Compl. ¶ 675).

Plaintiff pleads Jacques "initiated private citizen
criminal prosecution" of Plaintiff in Connecticut.  (Compl.
¶ 665).  Plaintiff further pleads Jacques told Plaintiff that
"he and the defendants wanted to send Plaintiff for psychiatry
treatment."  (Compl. ¶ 667).  Plaintiff also makes various
conclusory allegations that Jacques and MDMC aided and abetted
in the alleged retaliation against him.  (Compl. ¶ 250).

The Court has reviewed the referenced October 6, 2017
letter, which appears to largely be the basis for Plaintiff's

claims against Jacques and MDMC.[13]  The letter begins by
referencing Plaintiff's communications with Task Management.
Jacques stated that Plaintiff's conduct was "intentionally set
out to 'harass, annoy or alarm' Task, its employees and its
client."  Jacques referenced the Connecticut Criminal Code and
stated: "The commission of a Class C misdemeanor in Connecticut
can result in imprisonment up to three months and a fine.  Also,
a person found to have violated that harassment statute can be
ordered to be examined by a psychiatrist."  Jacques also noted
civil liability that could result from Plaintiff's actions.  The
letter concluded as follows:

> Task has also learned that you have bombarded
> Campbell Soup with emails.  It is Task's understanding
> that Campbell Soup may initiate its own action against
> you.  However, you should know that you contacting
> Campbell Soup is in violation of your written agreement
> with Task.  Task is prepared to seek damages for your
> breach of the agreement, as well as injunctive relief.
> I understand that you have filed an action in the
> United States District Court for the State of New Jersey
> against Task alleging various constitutional violations.
> Task will respond to those allegations in accordance
> with the Federal Rules of Civil Procedure.
> Although Task has blocked all emails from you to
> reduce the distraction and disturbance you seek, it has
> made arrangements to capture those emails to be used as
> evidence.  So you should know that Task can and will use
> your recent harassing conduct in questioning your

---

[13]  "In deciding motions to dismiss pursuant to Federal Rule of
Civil Procedure 12(b)(6), courts generally consider only the
allegations in the complaint, exhibits attached to the
complaint, matters of public record, and documents that form the
basis of a claim."  <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 221 n.3
(3d Cir. 2004).  These letters clearly form the basis of
Plaintiff's claims against these defendants.

> credibility in your lawsuit. You should also know that
> the court could review your conduct and, as an
> appropriate remedy, dismiss your lawsuit or limit the
> evidence that you may introduce.
>
> If you do not cease your harassing conduct directed
> at Task, its employees and its client, Campbell's Soup,
> and any of its staff, Task will take all legal avenues
> available to it to seek proper redress. Task will not
> provide you with any further notice of its intended legal
> actions.

The Court finds this communication protected by the litigation privilege. First, as to whether the communication was made in judicial or quasi-judicial proceedings, the Court notes that "[t]he litigation privilege is not limited to statements made in a courtroom during a trial; 'it extends to all statements or communications in connection with the judicial proceeding.'" Hawkins, 661 A.2d at 289 (quoting Ruberton, 654 A.2d 1002). "The protection extends to pre-lawsuit communications about threatened or contemplated action," including pre-litigation demand letters. Id. The Court finds the October 6, 2017 letter to be a mix between a pre-litigation demand letter and a letter made in connection with the pending 17-7506 action. On the whole the Court finds the letter to be made in a "judicial or quasi-judicial proceeding" or in anticipation of such proceedings.

As an attorney on behalf of Task Management, Jacques and MDMC are clearly participants in such proceedings. See DeNicholas v. Centene Corp., No. 17-924, 2017 WL 7542616, at *2

35

(D.N.J. Oct. 20, 2017) ("Statements made by lawyers, judges, witnesses, and parties fall within the privilege's absolute protection."). The Court further finds the letter seeks to achieve the objects of litigation and has a logical relation to the action, both the 17-7506 action and the potential action for breach of contract and relating to Plaintiff's alleged harassment. See generally Thomason v. Norman E. Lehrer, P.C., 183 F.R.D. 161, 167 (D.N.J. 1998) ("New Jersey courts have found defamatory, even threatening statements by attorneys, and others only tangentially associated with the litigation, to have litigation as their objective.").

The Court finds this to be the case even in light of what appears to be threatened criminal action against Plaintiff. In the context of applying the litigation privilege to comments made in a settlement conference, the New Jersey Appellate Division stated:

> [D]uring such conferences an attorney must be free to advance the strengths of his or her client's case in a candid and objective way, unfettered by the fear that the attorney may be the subject of a tort action, whether sounding in defamation or any other "action under a different label." Indeed, during the conference counsel may well report that investigation has disclosed the fact that the adverse party had committed wrongdoings. Such disclosure by counsel may be in support of a defense to the adverse party's affirmative action, or may tend to minimize that party's damage claim. If these wrongdoings are undeniably criminal in nature, counsel should not be gagged from commenting on them by fear of civil suit.

Ruberton, 654 A.2d at 1007 (citation omitted) (quoting Rainer's
Dairies v. Raritan Valley Farms, Inc., 117 A.2d 889, 895 (N.J.
1955)).  The litigation privilege will apply to all claims
asserted against Jacques and MDMC.

The Court next considers those allegations made against
Wetchler and Duane Morris.  Plaintiff pleads Wetchler, a legal
representative for Campbell Soup, wrote a letter to Plaintiff on
November 15, 2017 to inform him that his role at Campbell Soup
had been filled in October 2017.  (Compl. ¶¶ 27, 230, 739).
Plaintiff argues this information "contradicted the fact that
Campbell's Soup Company had retained and paid an executive
search firm to look for a person with Plaintiff's skill set."
(Compl. ¶¶ 191, 232).  Plaintiff pleads Wetchler "helped and
encouraged" Campbell Soup and Task Management "to lie and cover-
up forbidden unlawful employment practices against Plaintiff."
(Compl. ¶ 235).  As with Jacques and MDMC, Plaintiff also makes
conclusory allegations that Wetchler and Duane Morris aided and
abetted in the alleged retaliation against him.  (Compl. ¶¶ 236-
69).

Wetchler's November 15, 2017 letter, which this Court has
reviewed, informed Plaintiff "that the temporary role that [he]
performed at Campbell's Soup Company was filled in October."  It
also referenced Plaintiff's Complaint in the 17-7506 action,
stating "Campbell Soup Company unequivocally denies that [his]

37

work ended because of any Title VII or other employment discrimination charge" and that "Campbell Soup Company is not a party to [the] contract with Task Management."

The Court finds the litigation privilege applicable here as well. Wetchler references the 17-7506 action and represents Campbell Soup, at one point a party to the 17-7506 action and, even when Plaintiff amended his complaint to remove Campbell Soup, Campbell Soup was required to participate by Court Order. The letter was clearly both logically related to the 17-7506 action and sought to achieve the objects of that litigation for Campbell Soup – disclaiming any Title VII liability.

As to all the Law Defendants, the Court further finds any claims of aiding and abetting or encouraging other Defendants to lie or coverup unlawful employment practices, even if sufficiently pleaded, must fail under the litigation privilege. See, e.g., Allia v. Target Corp., No. 07-4130, 2008 WL 1732964, at *8-9 (D.N.J. Apr. 10, 2008) ("To allow defendants to be liable for communications made within the course of their representation of their client in a judicial proceeding would defeat the 'unfettered expression' that is critical to the administration of justice."). The Law Defendants will be dismissed as parties from this action.

## E. Plaintiff's Claims

### 1. Title VII

42 U.S.C. § 2000e-3(a) provides:

Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment[ or] for an employment agency . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

Plaintiff alleges Title VII violations against both Campbell Soup and Task Management. The Court interprets Plaintiff's claims to be two Title VII retaliation claims: one for his termination (Count 1) and the other for discrimination against him as an applicant after his termination (Count 2).

"To establish a _prima facie_ case of retaliation under Title VII . . . , a plaintiff must produce 'evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" _Tourtellotte v. Eli Lily & Co._, 636 F. App'x 831, 852 (3d Cir. 2016) (quoting _Moore v. City of Philadelphia_, 461 F.3d 331, 340-41 (3d Cir. 2006)).

**a. Title VII Claims Against Campbell Soup**

The Court will dismiss Plaintiff's Title VII claims against
Campbell Soup. The Court first considers whether Campbell Soup
is considered an employer under Title VII. "In determining
whether an entity is an 'employer' for purposes of Title VII,
[the Third Circuit] consider[s] the factors articulated in
Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24
(1992)." Plaso v. IJKG, LLC, 553 F. App'x 199, 203-04 (3d Cir.
2014). "The essence of the Darden test is whether the hiring
party has the 'right to control the manner and means by which
the product is accomplished.'" Id. at 204 (quoting Darden, 503
U.S. at 323). The Third Circuit "ha[s] held that courts
applying Darden may focus on three indicia of control: (1) which
entity paid plaintiff; (2) who hired and fired plaintiff; and
(3) who 'had control over [plaintiff's] daily employment
activities.'" Id. (second alteration in original) (quoting
Covington v. Int'l Ass'n of Approved Basketball Officials, 710
F.3d 114, 119 (3d Cir. 2013)).

> The court may consider the following non-exhaustive list
> of factors: (1) "the skill required"; (2) "the source of
> the instrumentalities and tools"; (3) "the location of
> the work"; (4) "the duration of the relationship between
> the parties"; (5) "whether the hiring party has the right
> to assign additional projects to the hired party"; (6)
> "the extent of the hired party's discretion over when
> and how long to work"; (7) "the method of payment"; (8)
> "the hired party's role in hiring and paying
> assistants"; (9) "whether the work is part of the regular
> business of the hiring party"; (10) "whether the hiring

party is in business"; (11) "the provision of employee benefits"; and (12) "the tax treatment of the hired party."

Id. at 204 n.3 (quoting Darden, 503 U.S. at 323-24). The Third Circuit has approved of a district court "engag[ing] in a detailed, considered discussion of the three Covington indicia" without detailed analysis of the twelve-factor Darden test. Id. at 204. "However, '[s]ince the common-law test contains "no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive."'" Fausch v. Tuesday Morning, Inc., 808 F.3d 208, 214 (3d Cir. 2015) (alterations in original) (quoting Darden, 503 U.S. at 324).[14]

The Court looks to the three Covington indicia first. Campbell Soup was not the entity paying Plaintiff. Rather, the Task Management Agreement provided that Task Management would pay Plaintiff "at a rate of $73.00 per hour for every hour approved by [Campbell Soup]." It further provided, however, that Task Management was "only obligated to pay [Plaintiff] for those hours that are approved by [Campbell Soup]." Thus, while

---

[14] The statutory guidance on this issue is virtually nonexistent. 42 U.S.C. § 2000e(f) states: "The term 'employee' means an individual employed by an employer . . . ." The definition is one of "magnificent circularity." Broussard v. L.H. Bossier, Inc., 789 F.2d 1158, 1160 (5th Cir. 1986).

payment came from Task Management, Campbell Soup's approval of Plaintiff's hours certainly played a role in the process. While it appears from Plaintiff's Complaint that it was Task Management who hired and ultimately fired Plaintiff, Plaintiff did interview with Campbell Soup on its request before obtaining the position. More importantly, the Task Management Agreement gave Campbell Soup the authority to terminate the agreement, effectively firing Plaintiff. Further, it is clear to the Court that Plaintiff's allegations show Campbell Soup controlled Plaintiff's daily employment activities. Plaintiff was given his assignments from Campbell Soup employees, (Compl. ¶ 438), and he had various supervisors at Campbell Soup. (Compl. ¶¶ 72, 152). His various proposals on the projects were submitted to his supervisors. (Compl. ¶ 457).

Considering the more exhaustive twelve-factor test, the Court discerns the following relevant facts from Plaintiff's Complaint. As to the location of the work (factor two), Plaintiff worked at a Campbell Soup facility in Camden, New Jersey. (Compl. ¶ 437). As to the source of the instrumentalities and tools (factor three), Campbell Soup provided him with a work laptop, an office space, an e-mail address, and an electronic access key. (Compl. ¶ 443). Keller further informed Plaintiff he was attempting to obtain a company credit card for Plaintiff to assist with travel connected to his

projects. (Compl. ¶ 495). As to whether Campbell Soup had the right to assign additional projects to Plaintiff (factor five), Plaintiff pleads he was informed by Keller "that there were additional Projects to be assigned to Kamdem Group." (Compl. ¶ 900). As the Court previously indicated, Plaintiff also pleads involvement of Campbell Soup in the payment process (factor seven). As to whether the work was part of Campbell Soup's regular business (factor nine), Plaintiff pleads the Flavor Technology unit is "vital for the Company product lines" and is therefore likely part of the regular business of Campbell Soup. (Compl. ¶ 463). Plaintiff's work was also integrated with other Campbell Soup employees. (Compl. ¶¶ 460-62).

While the Court notes a lack of information as to some other factors (factors eleven and twelve, for instance), and while the Court notes the duration of the relationship weighs against finding an employment relationship (factor four), the Court finds Plaintiff's allegations, together with the information provided in the Task Management Agreement, are sufficient to find Campbell Soup is an employer under Title VII at this stage of the litigation, where this Court is constrained to accept Plaintiff's factual allegations as true and make all reasonable inferences in favor of Plaintiff.

Despite this finding, the Court finds Plaintiff has failed to plead a causal connection as to Campbell Soup on either of

his Title VII theories.  Plaintiff has not shown Campbell Soup was aware of any prior Title VII lawsuit, that Campbell Soup played a part in his termination, or that Campbell Soup's decision not to rehire him was in any way related to any protected conduct.  Plaintiff's Title VII claim against Campbell Soup will be dismissed.

### b. Title VII Claims Against Task Management

The Court finds sufficient evidence that Task Management constitutes an employment agency at this stage.  Task Management's briefing is dedicated to objecting to a finding that Task Management is Plaintiff's employer.  However, it is clear to this Court that Plaintiff is resting his Title VII claims against Task Management in its capacity as an employment agency.  (Compl. ¶ 49 ("Task Management is an 'Employment Agency' as defined in 42 U.S.C. § 2000e-(c).")).

42 U.S.C. § 2000e states: "The term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person."  "[T]he definition of 'employment agency' . . . 'require[s] that, in order to be an "employment agency," the entity must regularly do business with an "employer," and the term "employer" as used in the definition of "employment agency" is limited to those employers that fall

within the definition of "employer."'" Kemether v. Pa.
Interscholastic Ath. Ass'n, 15 F. Supp. 2d 740, 763 (E.D. Pa.
1998) (quoting Jones v. Se. Ala. Baseball Umpires Ass'n, 864 F.
Supp. 1135, 1138 (M.D. Ala. 1994)).

The Task Management Agreement states that Task Management
"serves as a broker between individuals, companies and
corporations seeking individuals, companies and corporations
with various computer skills and individuals, companies and
corporations with those skills." Its "Privacy Policy" further
states: "Task Management . . . is in the business of permanent
and temporary placement and recruitment of information
technology specialists." It is clear from the Task Management
Agreement that Campbell Soup, an employer under Title VII, is a
client of Task Management. This is sufficient at this stage for
the Court to find Task Management regularly does business with
an employer. Accordingly, the Court finds Task Management is an
employment agency as defined by Title VII.

The Court finds Plaintiff has sufficiently pleaded a Title
VII claim based on his termination. Plaintiff has proffered
sufficient allegations of participation in protected activities.
Plaintiff pleads he has "sued some former employers on protected
grounds." (Compl. ¶ 609). He specifically pleads he has "sued
his previous employer under Title VII of Civil Rights Act" in
the Southern District of New York. (Compl. ¶ 1228). He states

this lawsuit was based on discrimination against him for his religious practices. (Compl. ¶ 362). The Court finds at the motion to dismiss stage that this allegation is sufficient to show a protected activity.[15] Plaintiff has further sufficiently pleaded an adverse employment action. It is axiomatic that termination constitutes an adverse employment action. Finally, Plaintiff sufficiently pleads a causal connection as to Task Management in alleging that Corie Hess explicitly told him the reason he was terminated was because of his previous lawsuits. (Compl. ¶ 34).[16]

On his not being rehired, however, on September 8, 2017, Plaintiff ceased to be represented by Task Management for job postings for Campbell Soup, upon Plaintiff's prompting. (Compl. ¶¶ 546-47). Thus, Plaintiff not being rehired for a position at

---

[15] Plaintiff's retaliation claim stemming from his termination has its basis in proceedings with former employers, not Task Management or Campbell Soup. However, "Title VII prohibits an employer from retaliating against an employee for participating in a separate Title VII proceeding against a previous employer." Chatterjee v. Mathematics, Civics & Sciences Charter Sch., No. 01-5626, 2008 WL 2929061, at *10 n.20 (E.D. Pa. July 30, 2008) (citing Second Circuit, Seventh Circuit, and Ninth Circuit precedent).

[16] The Court notes that Plaintiff also pleads additional lawsuits that do not appear to have been brought based on a Title VII unlawful employment practice. However, at the motion to dismiss stage, the Court finds Plaintiff has sufficiently pleaded a causal connection to his termination in his pleading of a previous Title VII suit and Hess's communication that his termination was related to at least one of his previous lawsuits, even if the lawsuits were not specifically identified.

Campbell Soup lacks a causal connection to Task Management.  The
Court will allow Plaintiff's Title VII claim to proceed against
Task Management based solely on his termination.  His Title VII
claims will otherwise be dismissed.

**2. NJLAD**

The Court finds Plaintiff has failed to sufficiently plead
a cause of action under the NJLAD against all defendants except
Task Management.  The NJLAD provides:

> It shall be an unlawful employment practice, or, as the
> case may be, an unlawful discrimination . . . [f]or any
> person to take reprisals against any person because that
> person has opposed any practices or acts forbidden under
> this act because that person has filed a complaint,
> testified or assisted in any proceeding under this act
> or to coerce, intimidate, threaten or interfere with any
> person in the exercise of enjoyment of, or on account of
> that person having aided or encouraged any other person
> in the exercise or enjoyment of, any right granted or
> protected by this act.

N.J.S.A. 10:5-12(d).  "[T]o establish a prima facie case of
discriminatory retaliation, plaintiffs must demonstrate that:
(1) they engaged in a protected activity known by the
[defendant]; (2) thereafter their employer unlawfully retaliated
against them; and (3) their participation in the protected
activity caused the retaliation."  Tartaglia v. UBS PaineWebber,
Inc., 961 A.2d 1167, 1193 (N.J. 2008) (quoting Craig v. Suburban
Cablevision, Inc., 660 A.2d 505, 508 (N.J. 1995)).

The NJLAD also imposes liability for aiding and abetting in
unlawful discrimination practices.  N.J.S.A. 10:5-12(e) states:

"It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination . . . [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."  There are three elements for an NJLAD aiding and abetting claim:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

Bobo v. Wildwood Pub. Sch. Bd. of Educ., No. 13-5007, 2014 WL 7339461, at *16 (D.N.J. Dec. 23, 2014) (quoting Hurley v. Atl. City Police Dep't, 174 F.3d 95, 126 (3d Cir. 1999)).

Plaintiff appears to assert his NJLAD claims against all Defendants.  Unlike N.J.S.A. 10:5-12(a)-(c), which are applicable only to employers (subsection a), labor organizations (subsection b), and employers or employment agencies (subsection c), N.J.S.A. 10:5-12(d) applies broadly to "persons," as does the aiding and abetting provision in N.J.S.A. 10:5-12(e). "Person" is defined in N.J.S.A. 10:5-5(a) as "one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries."  All defendants in this case qualify as "persons."  See Hargrave v.

<u>County of Atlantic</u>, 262 F. Supp. 2d 393, 436 (D.N.J. 2003)
(providing that both N.J.S.A. 10:5-12(d) and N.J.S.A. 10:5-12(e)
"expressly contemplate direct liability for individual
supervisory employees"). All are therefore subject to N.J.S.A.
10:5-12(d) and (e).

For the same reason the Court will dismiss Plaintiff's
Title VII claim against Campbell Soup, the Court will also
dismiss Plaintiff's NJLAD claim against Campbell Soup. As to
Task Management, the Court will allow Plaintiff's NJLAD claim to
proceed, again solely based on his termination.[17] As to the
individual defendants, the Court finds Plaintiff's pleadings
wholly inadequate. Plaintiff largely makes the same allegations
as to each defendant. His allegations are broad, unspecific,
and conclusory. A statement that an individual supported a
decision and a vague statement that an individual lied or helped
coverup an unlawful employment practice is insufficient to plead
a claim under the NJLAD. The Court will dismiss Plaintiff's
NJLAD claims against all defendants other than Task Management.

---

[17]    With regard to Plaintiff's Title VII claim, The Court found
Plaintiff sufficiently pleaded protected activity in stating he
had sued a previous employer under Title VII based on religious
discrimination. While Plaintiff does not plead that any of his
previous lawsuits were based on NJLAD violations, the NJLAD also
proscribes religious discrimination. The Court finds
Plaintiff's allegations of protected conduct sufficient to
withstand this motion to dismiss.

## 3. NJCEPA

The Court will dismiss Plaintiff's cause of action under NJCEPA, as the Court finds this is not a whistleblower case. "A plaintiff asserting a CEPA violation must show: (1) a reasonable belief that her employer's conduct violated a law, rule, or regulation; (2) a whistle-blowing activity; (3) an adverse employment action; and (4) a causal connection between her whistle-blowing activity and the adverse employment action." Smith v. Township of East Greenwich, 519 F. Supp. 2d 493, 510 (D.N.J. 2007). While Plaintiff asserts a claim under the NJCEPA, it is clear to this Court that this is not a whistleblower case. Rather, Plaintiff is (1) alleging retaliation based on complaints filed regarding other employers and (2) alleging retaliation, after his termination, based on a complaint regarding these employers, alleging failure to rehire.

"[R]etaliatory action . . . [is] a required CEPA element." Kanafani v. Lucent Techs. Inc., No. 07-11, 2009 WL 3055363, at *12 (D.N.J. Sept. 18, 2009). Importantly, a plaintiff alleging an NJCEPA violation must show "a reasonable belief that her employer's conduct violated a law, rule, or regulation." Smith, 519 F. Supp. 2d at 510. Plaintiff's claim arising from his termination is based on complaints filed regarding other employers and does not fall within the NJCEPA's confines. Further, "[a] retaliatory action is defined as 'the discharge,

50

suspension or demotion of an employee, or other adverse

employment action taken against an employee in the terms and

conditions of employment.'" Id. (quoting N.J.S.A. 34:19-2(e)).

"Therefore, actions taken after an employee's termination cannot

support a CEPA claim." Id. (citing Beck v. Tribert, 711 A.2d

951, 955-56 (N.J. Super. Ct. App. Div. 1995)); accord Beck, 711

A.2d at 956 ("[T]he Legislature intended to include under CEPA

only adverse employment actions that are taken against an

employee while he or she is still an employee, and not after

termination."). Consequently, Plaintiff's claims arising from

his not being rehired also do not fall within the confines of

the NJCEPA.[18]

_____

[18]    The Court notes that it will not apply the NJCEPA's waiver
provision to bar any of Plaintiff's other claims, despite
Plaintiff's inclusion of a cause of action under the NJCEPA.
The NJCEPA's waiver provision states:

> Nothing in this act shall be deemed to diminish the
> rights, privileges, or remedies of any employee under
> any other federal or State law or regulation or under
> any collective bargaining agreement or employment
> contract; except that the institution of an action in
> accordance with this act shall be deemed a waiver of the
> rights and remedies available under any other contract,
> collective bargaining agreement, State law, rules or
> regulation or under the common law.

(emphasis added).
     "[T]he waiver provision applies only to those causes of
action that require a finding of retaliatory conduct that is
actionable under CEPA." Young v. Schering Corp., 660 A.2d 1153,
1160 (N.J. 1995). The Court recognizes that "[t]he waiver
provision applies to claims upon the institution of a CEPA
claim, therefore a claim will not be saved merely because a

51

## 4. Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

The Court next considers Plaintiff's breach of contract claim, asserted against both Campbell Soup and Task Management. The only agreement Plaintiff references to which he is a party is the Task Management Agreement. It appears Plaintiff is resting the breach of contract claim against Campbell Soup on its position as an apparent "beneficiary" of the contract. However, Campbell Soup remains a nonparty to that contract, and it is axiomatic that one cannot breach a contract he is not a party to. The breach of contract claim against Campbell Soup must be dismissed, as must the claim of breach of the implied covenant of good faith and fair dealing. See, e.g., Noye v. Hoffmann-La Roche Inc., 570 A.2d 12, 14 (N.J. Super. Ct. App. Div. 1990) ("In the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing."

_____

court dismisses the underlying CEPA claim." Espinosa v. County of Union, No. 01-3655, 2005 WL 2089916, at *11 (D.N.J. Aug. 30, 2005); accord Lynch v. New Deal Delivery Serv., 974 F. Supp. 441, 456 (D.N.J. 1997) ("[B]ecause it is the institution of the CEPA claim that triggers the waiver provision, Lynch's claim of intentional infliction of emotional distress would not be saved by this Court's dismissal of the underlying CEPA action for failure to comply with the statute of limitations." (citing Flaherty v. The Enclave, 605 A.2d 301 (N.J. Super. Ct. Law Div. 1992))). However, the Court finds the NJCEPA wholly inapplicable, no matter how well-pleaded by Plaintiff. See generally Young, 660 A.2d at 1159 ("The internal structure of the waiver provision . . . supports its narrow application."). The Court will not apply NJCEPA's waiver provision here.

(citing <u>McQuitty v. Gen. Dynamics Corp.</u>, 499 A.2d 526, 529 (N.J. Super. Ct. App. Div. 1985); <u>Brunner v. Abex Corp.</u>, 661 F. Supp. 1351, 1356 (D.N.J. 1986))).

The breach of contract claim against Task Management will also be dismissed. Under Connecticut law, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." <u>Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.</u>, 87 A.3d 534, 540 (Conn. 2014).

The "Termination" provision of the Task Management Agreement, Section 2.03, states:

> Termination of this Agreement will occur at the earliest of the following events.
>
> A.   The completion of the Assignment, that is the project assigned to the Consultant, or
>
> B.   <u>at the election of</u> the Company or the Client, or the Consultant.

(emphasis added). The Task Management Agreement clearly provides that it could be terminated by either party, or by Campbell Soup, for any reason. The Court will dismiss Plaintiff's breach of contract claim against Task Management as well.

The Court will also dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. "[I]t is axiomatic that the . . . duty of good faith and fair dealing is

a covenant implied into a contract or a contractual relationship." De Law Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d 382, 387 (Conn. 2004) (second alteration in original) (quoting Hoskins v. Titan Value Equities Grp., Inc., 749 A.2d 1144, 1146 (Conn. 2000)). "In other words, every contract carries an implied duty 'requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.'" Id. at 388 (quoting Gaudio v. Griffin Health Servs. Corp., 733 A.2d 197, 221 (Conn. 1999) (Callahan, C.J., dissenting)). "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." Id. (quoting Celentano v. Oaks Condo. Ass'n, 830 A.2d 164 (Conn. 2003)). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." Id. (alteration in original) (quoting Alexandru v. Strong, 837 A.2d 875, 883 (Conn. 2004)).

"Most courts decline to find a breach of the covenant apart from a breach of an express contract term." Landry v. Spitz, 925 A.2d 334, 344 (Conn. Ct. App. 2007). "Stated otherwise,

'the claim [that the covenant has been breached] must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty.'" Id. (quoting S. Williston, Contracts § 63.22 (4th ed. Lord 2000)). The Court does not find a breach of contract claim here. There was further no standard provided for terminating Plaintiff that could be exercised in bad faith. Under the Task Management Agreement, the contract could be terminated without reason.

"[A] plaintiff bringing a claim for violation of the covenant of good faith and fair dealing must also establish that she does not otherwise have an adequate means of vindicating that public policy." Bennett v. Beiersdorf, Inc., 889 F. Supp. 46, 49 (D. Conn. 1995) (citing Atkins v. Bridgeport Hydraulic Co., 501 A.2d 1223, 1226 (Conn. Ct. App. 1985)). The Court finds Title VII provides such an adequate means. See, e.g., Cox v. Namnoun, No. 95-37, 1996 U.S. Dist. LEXIS 22586, at *28-29 (D. Conn. Sept. 26, 1996) ("Title VII provides a specific remedy against an employer who violates the public policy considerations involved in sex discrimination."). Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims will be dismissed.

### 5. **Negligence, Negligence Per se, Gross Negligence**

Plaintiff's claims of negligence, negligence per se, and gross negligence will be dismissed with prejudice.  "In New Jersey, . . . it is widely accepted that a negligence cause of action requires the establishment of four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Jersey Cent. Power & Light Co. v. Melcar Util. Co., 59 A.3d 561, 571 (N.J. 2013); accord Lee v. Won Il Park, No. 12-7437, 2016 WL 3041845, at *3 (D.N.J. May 26, 2016).  In Connecticut, the elements are identical: "duty; breach of that duty; causation; and actual injury." Sturm v. Harb Dev., LLC, 2 A.2d 859, 870 (Conn. 2010) (quoting Jagger v. Mohawk Mountain Ski Area, Inc., 849 A.2d 813, 822 n.13 (Conn. 2004)).  It is entirely unclear to this Court which of Plaintiff's factual allegations are intended to support its negligence claims, nor is the Court able to discern a meritorious claim for negligence on its own from Plaintiff's allegations.  Plaintiff has failed to plead a cause of action for negligence or gross negligence.

Further, "[u]nder New Jersey law, a negligence per se claim is supported by a violation of a statute or regulation when said statute or regulation 'serve[s] to impose direct tort liability.'" Lee, 2016 WL 3041845, at *2 (alteration in original) (quoting Chelsea Check Cashing, L.P. v. Toub, No. 02-

5557, 2006 WL 54303, at *3 (D.N.J. Jan. 9, 2006)).  To begin the analysis of a negligence per se claim, "the Court must first look to the statute or regulation that was violated."  <u>Id.</u> Connecticut law provides similarly: "Under Connecticut law, negligence per se is a separate cause of action from negligence and enables plaintiffs to establish as a matter of law that the defendant's conduct constituted a breach of duty, so that only causation and damages need be proved."  <u>Anchundia v. Ne. Utils. Serv. Co.</u>, No. 07-4446, 2010 WL 2400154, at *4 (E.D.N.Y. June 11, 2010).  "Where plaintiff fails to identify the statute upon which the claim is based, it is impossible . . . to assess whether the defendant breached a duty imposed by statute."  <u>Id.</u> at *5.  Plaintiff has not pointed to any such statute or regulation.  To the extent Plaintiff was attempting to rely on Title VII or the NJLAD, the Court rejects that theory.  <u>See</u> <u>Black v. Cmty. Educ. Ctrs., Inc.</u>, No. 13-6102, 2014 WL 859313, at *5 (E.D. Pa. Mar. 4, 2014).  Further, while Plaintiff cites the New Jersey Unemployment Compensation Law throughout his Complaint, the Court sees no relevance of this law for Plaintiff's negligence per se claim.  These claims will be dismissed with prejudice.

### 6. Defamation

The Court will dismiss Plaintiff's claim for defamation. "In New Jersey, an action for defamation requires the plaintiff

to establish: '(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting to at least negligence by the publisher.'" Marino v. Westfield Bd. of Educ., No. 16-361, 2017 WL 216691, at *6 (D.N.J. Jan. 18, 2017) (quoting DeAngelis v. Hill, 847 A.2d 1261, 1267-68 (N.J. 2004)). "Libel is defamation by written or printed words, or by the embodiment of the communication in some tangible or physical form, while slander consists of the communication of a defamatory statement by spoken words, or by transitory gestures." Id. (quoting W.J.A. v. D.A., 43 A.3d 1148, 1153 (N.J. 2012)). The law is similar in Connecticut. See Simms v. Seaman, 69 A.3d 880, 893-94 (Conn. 2013) ("A defamation action is based on the unprivileged communication of a false statement that tends either to harm the reputation of another by lowering him or her in the estimation of the community or to deter others from dealing or associating with him or her." (quoting Woodcock v. Journal Publ'g Co., 646 A.2d 92, 105 (Conn. 1994) (Berdon, J., concurring))).

Plaintiff alleges various individual defendants, including at least Mohan, Hess, Harrison, Morrison, Barroso, Keller, and Hayes, "slandered, libeled, and/or defamed Plaintiff as a bad person, unfit to work for Campbell's Soup Company or anybody else." Plaintiff alleges these statements were made to

employees at Task Management and Campbell Soup. Plaintiff further pleads these individuals defamed him by stating that he "is a criminal and a dangerous mentally disordered person to be compelled to psychiatry confinement/treatment." Plaintiff pleads this statement was communicated to the Ridgefield, Connecticut police. Plaintiff alleges these statements led to his removal from the Campbell Soup projects.

Plaintiff appears to allege three distinct defamatory statements: (1) that he is a "bad person"; (2) that he is "unfit to work for Campbell's Soup Company or anybody else"; and (3) that he "is a criminal and a dangerous mentally disordered person to be compelled to psychiatry confinement/treatment." However, Plaintiff alleges these identical statements were made by every defendant identified. Plaintiff further fails to provide sufficient allegations to put Defendants on notice, such as whether they were written or spoken and who, in particular, these statements were communicated to. The Court will dismiss Plaintiff's defamation claim.

### 7. Wrongful Termination

The Court will dismiss Plaintiff's claim for wrongful termination against all Defendants. "Under New Jersey law 'an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy.'" <u>Lawrence v. Nat'l Westminster Bank</u>, 98 F.3d 61, 73 (3d Cir.

1996) (quoting Pierce v. Ortho Pharm. Corp., 417 A.2d 505, 512
(N.J. 1980)).  "The sources of public policy include
legislation; administrative rule, regulations or decisions; and
judicial decisions."  Id. (quoting Pierce, 417 A.2d at 512).
However, "[c]ommon law claims for wrongful termination are pre-
empted when a statutory remedy exists."  Parikh v. UPS, 491 F.
App'x 303, 307 (3d Cir. 2012) (stating dismissal was proper
where a "wrongful termination claim was based on the same set of
facts as [a] discrimination claim[]"); accord Lawrence, 98 F.3d
at 73 ("Because the sources of public policy [the plaintiff]
relies on are conterminous with his statutory claims, he cannot
advance a separate common law public policy claim.").  The same
is true under Connecticut law.  Vera v. Waterbury Hosp., No. 10-
1417, 2010 WL 4736278, at *2 (D. Conn. Nov. 16, 2010) ("Where an
employee has a statutory remedy, however, the common law claim
of wrongful discharge is unavailable." (citing Atkins v.
Bridgeport Hydraulic Co., 501 A.2d 1223, 1226 (Conn. Ct. App.
1985))).  Plaintiff's wrongful termination claim will be
dismissed.

## 8. Intentional Infliction of Emotional Distress

The Court will also dismiss Plaintiff's claim for
intentional infliction of emotional distress as to all
Defendants.  "Under New Jersey law, a claim of intentional
infliction of emotional distress requires a plaintiff to

establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Sarlo v. Wells Fargo Bank, N.A., 175 F. Supp. 3d 412, 428-29 (D.N.J. 2015) (citing Taylor v. Metzger, 706 A.2d 685, 694 (N.J. 1998); Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857, 863 (N.J. 1988)).  Connecticut law requires similarly.  See Aviles v. Wayside Auto Body, Inc., 49 F. Supp. 3d 216, 228-29 (D. Conn. 2014) ("Connecticut law requires a plaintiff to establish the following four elements: '(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of plaintiffs distress; and (4) that the emotional distress sustained by the plaintiff was severe.'" (quoting Appleton v. Bd. of Educ. of Town of Stonington, 757 A.2d 1059, 1062 (Conn. 2000))).

"[U]nder New Jersey law, intentional infliction of emotional distress comprehends conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Edmond v. Plainfield Bd. of Educ., 171 F. Supp. 3d 293, 316 (D.N.J. 2016) (alteration in original) (quoting Subbe-Hirt v. Baccigalupi, 94 F.3d 111, 114 (3d Cir. 1996)); accord Mercado v. PRRC, Inc., No.

15-637, 2015 WL 6958012, at *2 (D. Conn. Nov. 10, 2015) ("Liability is imposed 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" (quoting Appleton, 757 A.2d at 1062)).

Plaintiff has failed to sufficiently plead outrageous conduct on the part of any of the defendants. It is less than clear, but from the Court's reading of Plaintiff's Complaint, the basis for Plaintiff's claim of outrageous conduct lies in his termination. "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Edmond, 171 F. Supp. 3d at 316 (alteration in original) (quoting Cox v. Keystone Carbon Co., 864 F.2d 390, 395 (3d Cir. 1988)). Further, under Connecticut law, "[f]iring an employee, in spite of any allegedly wrongful motive, does not qualify as extreme or outrageous conduct." Credle-Brown v. Connecticut, 502 F. Supp. 2d 282, 300 (D. Conn. 2007) (providing that, under Connecticut law, "the court must assess whether the employer's conduct, not the employer's motive, was extreme or outrageous"). Plaintiff's intentional infliction of emotional distress claim will be dismissed.

**9. Tortious Interference with Contract, Business and Economic Opportunities**

"Under New Jersey law, the elements of tortious interference with a contractual relationship claims and tortious interference with a prospective economic advantage claims are nearly identical." <u>A. & M. Wholesale Hardware Co.</u>, 2014 WL 714938, at *8. "To state a claim for tortious interference with a contractual relationship, the plaintiff must allege 1) a protectable right, i.e., a contract; 2) intentional and malicious interference with a protectable right 3) that causes a loss with resulting damages." <u>Id.</u> (citing <u>Printing Mart-Morristown v. Sharp Elecs. Corp.</u>, 563 A.2d 31, 37 (N.J. 1989)). "Similarly, tortious interference with a prospective economic advantage claims must essentially allege the same elements." <u>Id.</u> "The only distinction is that it must allege a prospective economic advantage as the protectable right, as opposed to a contract." <u>Id.</u> The law is similar in Connecticut. <u>Am. Diamond Exch., Inc. v. Alpert</u>, 28 A.3d 976, 986 (Conn. 2011) ("It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."

(quoting Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 761 A.2d 1268, 1273 (Conn. 2000))).

The Court assumes the tortious interference with contract claim concerns the termination of the Task Management Agreement and the tortious interference with prospective economic advantage claim concerns Plaintiff not being rehired for the position at Campbell Soup.

"[A] tortious interference with contract claim cannot be directed at a person or entity that is a party to the contract." Ross v. Celtron Int'l, Inc., 494 F. Supp. 2d 288, 305 (D.N.J. 2007) (citing Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 173 (3d Cir. 2001)); accord Boulevard Assocs. v. Sovereign Hotels, 72 F.3d 1029, 1035 (2d Cir. 1995) ("[T]here can be no tortious interference of contract by someone who is directly or indirectly a party to the contract." (quoting Baum v. United Cable Television Corp. of E. Conn., No. 90-44673, 1992 WL 175119, at *4 (Conn. Super. Ct. July 20, 1992))). "Thus, '[a]n employee working for the corporation with which the plaintiff allegedly had a contract cannot serve as the third-party necessary for the tripartite relationship, unless the employee acted outside the scope of his employment.'" Id. (quoting Silvestre v. Bell Atl. Corp., 973 F. Supp. 475, 486 (D.N.J. 1997)); accord Miller v. Praxair, Inc., No. 05-402, 2009 WL 1748026, at *12 (D. Conn. June 18, 2009) ("[I]ndividual

defendants cannot be held liable for tortious interference with their employer's contract." (citing <u>Boulevard Assocs.</u>, 72 F.3d at 1035)).  Plaintiff appears to assert this cause of action against all Defendants.

The Court begins by recognizing that a tortious interference with contract claim cannot be maintained against Task Management – a party to the contract.  Further, all Task Management employees similarly cannot have this claim asserted against them, as Plaintiff's allegations do not show any of them were acting outside the scope of their employment.  Thus, the tortious interference with contract claim must be dismissed against Task Management, Mohan, Hess, and Harrison.[19]

That leaves the claim against Campbell Soup, Morrison, Barroso, Keller, and Hayes.  However, Plaintiff fails to plead this cause of action against these defendants.  Plaintiff pleads the various defendants "made the decision or supported the decision" to terminate the Task Management Agreement.  He also pleads the various defendants "helped and encouraged" the coverup of the allegedly unlawful employment practices.  These

---

[19]    Mohan, Hess, and Harrison are all identified as Task Management employees in Plaintiff's Complaint.  (Compl. ¶¶ 70, 88, 105).  Morrison, Barroso, Keller, and Hayes are all identified as employees of Campbell Soup.  (Compl. ¶¶ 123, 152, 177, 202-07).

allegations are too broad to support Plaintiff's claims, and they do not distinguish between each defendant.

The Court finds similarly with reference to Plaintiff's tortious interference with economic advantage claim, in which the economic advantage was a position with Campbell Soup. This claim must initially be dismissed as asserted against Campbell Soup, Morrison, Barroso, Keller, and Hayes, leaving only Task Management, Mohan, Hess, and Harrison. Plaintiff has failed to sufficiently plead his cause of action against the remaining defendants, as he has not shown any of the remaining defendants in any way interfered with Plaintiff being hired by Campbell Soup after his termination. The tortious interference claims will be dismissed.

## VIII. Setting Aside Entry of Default

The Clerk of the Court entered default against Cary Hayes on April 19, 2018 upon Plaintiff's April 18, 2018 request. Hayes now asks this Court to set aside the entry of default. Federal Rule of Civil Procedure 55(c) provides: "The court may set aside an entry of default for good cause . . . ."

> In exercising its discretion to set aside a default, a district court must consider (1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense, that is, whether the defendant's allegations, if established at trial, would constitute a complete defense to the action; and (3) whether the default was the result of the defendant's culpable conduct.

Dambach v. United States, 211 F. App'x 105, 109 (3d Cir. 2006)
(citing United States v. $55,518.05 in U.S. Currency, 728 F.2d
192, 194 (3d Cir. 1984)).

The Court first addresses Hayes's argument that Plaintiff's
Amended Complaint voided the entry of default against her.  The
Court agrees with the basic principle behind Hayes's argument.
Typically, a Clerk's entry of default on an original complaint
is rendered moot where an amended complaint supersedes the
original complaint.  See, e.g., Morris v. United States, No. 12-
2926, 2013 U.S. Dist. LEXIS 180321, at *3 (D.N.J. Dec. 13,
2013); Enigwe v. Gainey, No. 10-684, 2012 WL 213510, at *3 (E.D.
Pa. Jan. 23, 2012) ("The filing of the Second Amended Complaint
rendered the earlier Amended Complaint a nullity, and
[Plaintiff]'s request for an entry of default . . . as to the
Amended Complaint became moot." (citation omitted)).  This is
because "[a]n amended complaint super[s]edes the original
version in providing the blueprint for the future course of a
lawsuit."  Snyder v. Pascack Valley Hosp., 303 F.3d 271, 276 (3d
Cir. 2002).  Plaintiff's Amended Complaint, if validly filed,
renders the entry of default moot.  The Court does not render a
decision on the effect of this Court's refusal to consider
Plaintiff's Amended Complaint on this doctrine, as the Court
finds, in any event, that the Third Circuit's factor test for
vacating an entry of default favors vacatur.

First, the Court is not convinced prejudice would result to Plaintiff from setting aside the Clerk's entry of default. The Clerk's entry of default occurred just over four months after Plaintiff's Complaint was filed, and Hayes moved to set aside the entry of default days after its entry.[20] The Court finds a lack of prejudice to Plaintiff here. See, e.g., Dambach, 211 F. App'x at 109 ("[T]he defaults were entered not long after the filing of the complaints, and as Defendants moved to vacate the defaults shortly after their entry, the Dambachs were not prejudiced by the order vacating the entries of default.").

Second, it is clear to this Court that Hayes has a meritorious defense, as this Court will be dismissing all of Plaintiff's pending claims asserted against Hayes. Third, the Court finds Hayes's default was not the result of his culpable conduct, but rather a misunderstanding regarding service.[21] The Court can discern no "willful or bad faith conduct or deliberate trial strategy" used by Hayes. Id. at 109-10.

---

[20] The Clerk entered default on April 19, 2018. Hayes moved to set aside the entry of default on April 23, 2018.

[21] The Court does not address this service issue beyond finding it shows a lack of culpable conduct in the context of the motion to set aside entry of default.

## IX. Hayes's Motion to Dismiss for Lack of Personal Jurisdiction

The Court has already determined that all claims against Hayes will be dismissed.  Consequently, the Court will deny Hayes's motion as moot.  Hayes is permitted to move to dismiss for lack of personal jurisdiction in the event the Court later in this litigation allows Plaintiff to file an amended complaint that asserts claims against Hayes.[22]

## X. Motion Requiring Defendants to Answer Complaint

In the 18-298 action, Plaintiff filed a motion asking the Court to order Defendants to "format their Rule 12(b)(6) Motion into" an answer followed by a Rule 12(c) motion, in the interest

---

[22]    To the extent Plaintiff seeks leave to amend his complaint and assert claims against Hayes, the Court notes the following. In his opposition brief, Plaintiff appears to argue that, because Hayes has admitted to working in North America, she has submitted to personal jurisdiction in New Jersey.  He argues: "Defendant Hayes admits that Defendant Hayes['s] responsibilities cover[] 'North America'.  The State of New Jersey is without dispute geographically situated in North America.  Therefore, even without regard to the ongoing Action, Defendant Hayes has admitted that Defendant Hayes has ongoing business activities in the State of New Jersey."  Plaintiff misunderstands what is required for a court to have personal jurisdiction over a defendant.  The defendant must have sufficient contacts with the particular state, New Jersey in this case, for the court to assert its jurisdiction.
    Plaintiff also seems to argue that the Court has jurisdiction over Hayes on federal diversity or "supplemental grounds."  A court must have both subject matter jurisdiction over a matter and personal jurisdiction over each defendant. Diversity jurisdiction, a method of obtaining subject matter jurisdiction, is not a means of asserting personal jurisdiction, which requires a separate inquiry into the minimum contacts a defendant has with a particular state.

of efficiency and to avoid burdening the Court. The Court will deny this motion. Under the Federal Rules of Civil Procedure, it is within a defendant's discretion to file a motion to dismiss in lieu of filing an answer. The Court will not require otherwise. Plaintiff's motion will be denied.

## XI. Motions to Strike

### A. Motion to Strike Plaintiff's June 1, 2018 Letter

On June 13, 2018, Campbell Soup and Morrison moved to strike Plaintiff's May 21, 2018 letter, filed on June 1, 2018. In his letter, Plaintiff sought to inform the Court of the departure of Morrison from her role as CEO of Campbell Soup. Plaintiff cited news reports stating her departure was sudden and unexpected, and that Morrison provided no explanation for her departure. Plaintiff attempts to convince this Court that Morrison's departure was a result of an earlier report by Plaintiff to the EEOC regarding "discrimination or retaliation based upon sexual intercourse." Plaintiff appears to claim he will be bringing a new lawsuit with regard to this claim. Plaintiff's letter further argues that news reports of "changing consumer tastes" provides "an unbiased credibility to Plaintiff's allegations that Campbell's had determined that Flavor Technology was vital to the company's business."

Plaintiff ends his letter by comparing Morrison to "sexual intercourse felons such as Comedian Bill Cosby and Dr. Larry

Nassar." In what this Court interprets as Plaintiff's request for relief from this Court, Plaintiff states that "[t]hese facts should show to the Court that Defendants' acts against Plaintiff were as malicious and as vicious as it could possibly be under the heavens."

The Court begins by noting the moving defendants have cited no legal authority for their motion. The Federal Rules of Civil Procedure provide for motions to strike solely in the context of pleadings. Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."). Courts have repeatedly denied applying Rule 12(f) to matters outside the pleadings. See, e.g., SEPTA v. Orrstown Fin. Servs., No. 12-993, 2016 WL 7117455, at *7 (M.D. Pa. Dec. 7, 2016); South Annville Township v. Kovarik, No. 13-1780, 2014 WL 199020, at *5 (M.D. Pa. Jan. 16, 2014); Walthour v. Tennis, No. 06-86, 2008 WL 318386, at *8 (M.D. Pa. Feb. 4, 2008); United States v. Viola, No. 02-9014, 2003 WL 21545108, at *3 (E.D. Pa. July 10, 2003).

The Court will not strike Plaintiff's letter. However, the Court finds the letter inappropriate and irrelevant to the Court deciding this matter. The Court will disregard the letter in its entirety. See, e.g., SEPTA, 2016 WL 7117455, at *7. The

motion to strike is denied.[23]  The Court will further order

Plaintiff not to file informal letters with this Court that seek

relief from the Court or seek to supplemental Plaintiff's motion

papers.  Plaintiff must seek permission from the Court if he

seeks to supplement his motion papers.

### B. Motion to Strike Hayes's Motion to Dismiss

Plaintiff filed a Motion to Strike Hayes's Motion to

Dismiss on May 31, 2018.  The Court will not strike this motion.

That an entry of default had been declared against Hayes, and

that the Court had not yet ruled on the pending motion to vacate

the entry of default, is not grounds for striking the motion.

See, e.g., Heartland Payment Sys. v. Park, No. 06-3456, 2007

U.S. Dist. LEXIS 26734 (D.N.J. Apr. 10, 2007).  In any event, no

prejudice will result to Plaintiff in denying his motion to

strike, as the Court will be denying the motion as moot.

---

[23]  Plaintiff, who himself has alleged to be a victim of
defamation, is cautioned against making statements on this
Court's public docket that are irrelevant and potentially
defamatory, such as comparing a defendant to sex offenders.
Plaintiff is reminded of this Court's inherent authority to
sanction not only attorneys, but pro se litigants.  Rule 11
grants district courts "the power to sanction abusive pro se
litigants."  Thomas v. Conn. Gen. Life Ins. Co., No. 02-136,
2003 WL 22953189, at *3 (D. Del. Dec. 12, 2003) (quoting Ketchum
v. Cruz, 775 F. Supp. 1399, 1403 (D. Colo. 1991), aff'd, 961
F.2d 916 (10th Cir. 1992)).  While Rule 11 sanctions are
"intended to be used only in 'exceptional' circumstances,"
Ferreri v. Fox, Rothschild, O'Brien & Frankel, 690 F. Supp. 400,
405 (E.D. Pa. 1988), if Plaintiff's contact throughout this case
shows to be "exceptional," this Court will not hesitate to
sanction Plaintiff.

## XII. Consolidation

The Court will sua sponte consolidate these matters for all purposes.  Federal Rule of Civil Procedure 42(a) provides: "If actions before the court involve a common question of law or fact, the court may . . . consolidate the actions."  On January 19, 2018, Judge Schneider consolidated these matters "for discovery and case management purposes only."

The Court will now consolidate for all purposes.  This case will proceed under the 18-298 docket.

## XIII. Conclusion

The Court will allow Plaintiff's Title VII and NJLAD claim to proceed against Task Management on his termination theory. Plaintiff's claims will otherwise be dismissed.[24]

The Court must also consider the impact these rulings have on Plaintiff's Third Amended Complaint in the 17-7506 matter. All of the 17-7506 Defendants are also Defendants in the 18-298 matter.  Further, all of the claims asserted in the 17-7506

---

[24]    The Court recognizes that this Opinion and its accompanying Order will be filed prior to the full briefing of some of the motions in the 18-298 matter, namely the motions to strike.  The Court has also reviewed Plaintiff's requests for an extension of time to respond to those motions.  In light of the Court's decision to allow Plaintiff to move as appropriate for leave to amend, additional briefing from the parties will not affect the Court's decision on these motions.

matter are also asserted in the 18-298 matter.[25]  The Court has

sua sponte assessed Plaintiff's claims under the 17-7506 action

and finds all of its holdings applicable there.  The Court will

proceed with the original 18-298 Complaint as the only operative

Complaint as of the filing of this Opinion and its accompanying

Order.

Plaintiff is permitted to file a motion seeking leave to

amend in light of this Court's Opinion and Order.  Plaintiff

must attach a proposed amended complaint to such a motion.  The

Court will strike any purported amended complaint filed without

a motion seeking leave to amend.  Plaintiff must abide my

Federal Rule of Civil Procedure 8.  Any amended complaint must

seek to cure the deficiencies outlined by the Court in this

Opinion.  An amended complaint should not contain long

recitations of the contents of federal or state statutes.  This

Court is acquainted with these statutes, and their contents are

not to be pleaded in any amended complaint.  Plaintiff is

directed to treat each defendant as an individual, and not

merely cut and paste allegations and replace a defendant's name.

---

[25]    The Third Amended Complaint in the 17-7506 matter asserts
two NJLAD claims, an NJCEPA claim, and claims for breach of
contract, breach of the implied covenant of good faith and fair
dealing, negligence, defamation, wrongful termination,
intentional infliction of emotional distress, and tortious
interference with contract and economic advantage.

Plaintiff is not to file letters with the Court seeking the Court to grant him relief or to supplement any motion papers; such requests must be made in an appropriate motion.  Further, if, in the future, Plaintiff seeks permission to file an over-length brief, he is directed to file a separate letter request before the deadline for the filing of his brief, not in the same document as the brief on the day the brief is filed.

An appropriate Order will be entered.


Date: __July 9, 2018__           __ s/ Noel L. Hillman_____
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.